Filed 1/17/14  Tiffany P. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| TIFFANY P., | F068147 |
| Petitioner, | (Super. Ct. No. 515877) |
| v. | |
| THE SUPERIOR COURT OF STANISLAUS COUNTY, | **OPINION** |
| Respondent; | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | |
| Real Party in Interest. | |

**THE COURT**\*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Nadine Salim for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Real Party in Interest.

---

\*      Before Gomes, Acting P.J., Franson, J., and Peña, J.

-ooOoo-

Petitioner Tiffany P. (mother) seeks extraordinary writ relief (Welf. & Inst. Code, § 366.26, subd. (*l*)[1]; Cal. Rules of Court, rule 8.452) from the juvenile court's October 3, 2013, order made at the 18-month review hearing, in which the court terminated reunification services and set a hearing pursuant to section 366.26 to consider termination of parental rights and implementation of a permanent plan for mother's six-year-old son James P.[2]  We deny the petition on the merits.

## BACKGROUND

On September 13, 2010, the Stanislaus County Community Services Agency (Agency) filed a petition, which set forth nine allegations as to mother's unfitness for custody of her children James and Hailey, under section 300, subdivision (b).  Mother had been locking the children in a bedroom for long periods of time.  The children were removed from mother's care; James was placed with his father; and Hailey was placed in the home of a friend of mother's.  Mother was pregnant with her son Daniel at the time.  Several days after his birth, he was also removed from mother's physical custody and placed in the same home as Hailey.

A psychological assessment on mother found her to have an adjustment disorder with depressed mood, a history of bulimia, and a personality disorder.  Although mother had already received three years of parenting instruction from Parent Resource Center, including in-home mentoring, she was not able to translate the knowledge into appropriate actions.  An evaluation on James found that he fell into the mild to moderately severe category of autism.

---

[1]     Statutory references are to the Welfare and Institutions Code; rule references are to the California Rules of Court.

[2]     James is the oldest of mother's six children and the only child at issue on this writ.

2.

At a joint jurisdictional and dispositional hearing in December of 2010 and January of 2011, the juvenile court found that James, Hailey, and Daniel were persons described by section 300, subdivisions (b) and (g) and that removal of the children from mother's physical custody was appropriate.

Mother filed an appeal from the section 300 disposition findings and orders. On November 14, 2011, this court issued its opinion in the appeal (*In re James P. et. al.,* (Nov. 14, 2011, F061732 [nonpub.opn.]) and ordered a new disposition hearing. We found that the juvenile court "could have imposed stringent conditions, including frequent unannounced in-home visits, for mother on her use of the lock to confine her children, and on following the advice given to her by social workers and service providers as to her parenting behavior and mental health." James and Hailey were returned to mother's care. Daniel was released to the custody of both his parents, with the primary residence being with his father.

Slightly more than a month later, on February 23, 2012, the Agency filed a section 387 supplemental petition seeking removal of the children from mother's home. James and Hailey were detained and Daniel remained in his father's custody. The petition described a series of issues that had arisen over the course of the six weeks since the minors began extended visits in mother's home and were subsequently returned.

A contested detention hearing began on March 1, 2012. Following the testimony of various service providers, the parties agreed that Hailey would return to mother's care, but that James would continue in foster care and Daniel in his father's care.

At the contested jurisdiction/disposition hearing, which spanned several days and concluded on May 11, 2012, the juvenile court sustained the petition, finding that mother was unable to safely care for all three children, or even two children, at the same time. Specifically, the juvenile court found mother was not able to care full time for James at that point. The court found that the number of injuries to the children, albeit small, demonstrated by clear and convincing evidence that they were at a substantial risk of

3.

harm. The court noted that, although several of the service providers testified that mother did okay supervising the children, it was always in a situation where there were other adults present. The court found that mother's testimony lacked credibility.

The juvenile court ordered that Hailey remain in mother's care with family maintenance services; that James be removed from mother and father's care and placed in foster care with reunification services; and that Daniel be removed from mother's custody but remain placed with his father and reunification services ordered.

Mother appealed the orders from the section 387 hearing removing James from her care. On September 11, 2013, this court issued its opinion affirming the orders (*In re James P., et. al.,* (Sept. 11, 2013, F065284) [nonpub.opn.]).

By the time of the six-month review hearing on December 12, 2012, mother was living in a three-bedroom apartment with her roommate Brian H., Hailey and her new baby, Aubrey, who was not a dependent of the court. At the six-month review hearing, the juvenile court continued mother's reunification services and terminated reunification services for James's father. The court authorized the Agency to begin James's trial visits in mother's home.

The report prepared in anticipation of the 12-month review hearing recommended continued services for mother with James, who was still in foster care, where he was reported to be happy and thriving. The report addressed the issue of James's extended visits at mother's and her failure to appropriately respond to necessary medical care for James on a number of occasions. This eventually led to cancellation by the Agency of overnight visits with James for a time. Mother also cancelled a number of visits with James, including the time she took Aubrey to visit Aubrey's father in West Virginia, leaving Hailey with Brian and James with his foster family.[3]

---

**3** Although mother claimed Aubrey's father was a sperm donor, she now acknowledged that she knew who he was and that he lived on the East Coast.

4.

During this reporting period, the Agency learned that mother was again pregnant, this time with twins due in August of 2013. Mother planned to give the twins up for adoption to her friend who lived in another state. Mother's roommate, Brian, who was the father of the unborn babies, agreed with the plan of adoption. Mother claimed she and Brian had a platonic relationship. Mother was going to take Hailey and Aubrey with her to the other state four to six weeks prior to her due date so that delivery could happen where her friend lived. She would leave James with his foster family and "Skype" him while she was gone. Because of her pregnancy, mother stated that she could not take at least one of the medications she had been taking. Mother's doctor subsequently determined that she should not take any psychoactive medications while pregnant.

At the May 7, 2013, contested hearing, mother did not appear in court. Her attorney requested a continuance, stating that mother had not returned from her trip out of town. The juvenile court noted that, when the date was set, mother had said she would be available. The court denied the request for continuance finding no good cause. After argument, the juvenile court found, by a preponderance of the evidence, that return of James to mother would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. The court based its ruling on numerous factors: mother's failure to pay attention to James's medical needs, including the times she failed to pick him up from school when he was sick; the regression James exhibited after visits with mother; the tendency for mother to use the foster mother as a babysitter for her convenience; mother cancelling and changing visits with James at her own convenience; the amount of time mother spent researching issues on Facebook, the Internet and writing voluminous e-mails, time which would be better spent caring for her children; and mother's plan to leave James for six weeks while she went to another state to have her twins. The court ordered continued services until the 18-month hearing. Mother appealed from these orders and this court affirmed (case No. F067473).

The report prepared in anticipation of the 18-month review recommended termination of services and setting a section 366.26 hearing. The report indicated that mother now admitted she and Brian were in a relationship and they no longer intended to give the twins up for adoption, but would raise them together. The family became homeless and was given a voucher for two weeks of housing at a motel through a county homeless program. After that, the social worker lost track of the family until mother came to the Agency on July 23, 2013.

That same day, the social worker received a call from James's foster family stating that mother was living in a home with many other people and had had a visit with James there. According to mother, she had not contacted the Agency sooner because her phone was stolen. Mother also claimed that she was no longer in the house with many others, but was now renting a room in a different house. Mother was told that, until the adults in the home could be fingerprinted, James was not to visit her there.

The social worker and mother met and agreed that visits would be in a local park in the interim. While the social worker and mother were meeting, another social worker reported that Brian, who was in the waiting room with Aubrey and Hailey, had inappropriately forced Hailey to sit in a chair. Mother became incensed when told this and refused to believe that Brian would do that. Mother stated that she had attended an intake appointment for Section 8 housing and was waiting to hear from them.

The report stated that mother was not participating regularly in her case plan and was making little, if any, progress. Mother, who was supposed to be in mental health counseling, did not keep up visits when she became homeless. Mother was not taking medication due to her pregnancy.

Mother made numerous requests for changes to her scheduled visits with James, including on Mother's Day when she asked the foster mother to pick James up early because mother wanted to take the other children to the lake and there was no room for James in the car.

James was reported to be healthy and doing well in the foster home. He was comfortable in that environment and benefitting from the guidance, patience and routine his foster mother provided. James continued to have some behavior problems in school, although it was eventually agreed to mainstream him into a regular Kindergarten class in the Fall. James continued to receive intensive treatment with a support counselor who met with him weekly in his foster home and at school.

In evaluating the case, the social worker noted that the concerns about mother and her parenting skills with James remained the same as they were 18 months earlier. The report noted mother's mental health issues, her lack of parenting abilities, her lack of supervision of the children and her relationship with volatile people. Mother was overwhelmed caring for Aubrey and Hailey while being pregnant, even without James in the home. Mother continued to make poor decisions and did not put James' needs ahead of her own. James appeared to be improving only because of the intense supervision, attention and services he was receiving away from mother.

Attached to the review report were several police reports, including one in which mother had called the police because Hailey was missing. She was found inside the house. Another report was for a safety check requested by mother's obstetrician, because mother was expecting twins and had not been attending her appointments. Mother told officers that she had changed doctors and was now seeing a doctor in Madera.

Also attached to the report was a visitation log from the foster mother and notes from James's school. There was also a transcript of a Facebook conversation between mother and an anonymous individual, which took place on January 23 and 24, 2013.

Mother requested a contested hearing, which was set for October 1 and 3, 2013.

A supplemental report filed September 20, 2013, stated that mother had given birth to twin girls on September 10, 2013, and had reported to the hospital staff that she would not take her psychotropic medication because she wished to nurse the twins. Mother continued to live in a single room with Brian, Hailey, Aubrey and the twins.

7.

Mother and Brian failed to provide necessary documents to the Housing Authority, which resulted in denial of their Section 8 application.

After exhibiting difficult behaviors in mainstream Kindergarten, James was returned to his autism class and was doing better.

Mother had not returned to see her counselor or case manager. She had not contacted the social worker in some time, despite messages asking her to do so. The social worker reported that mother only did what she wanted to do and did "not appear to have any regard to her case." Mother had had 10 visits since the last report, although she had ended one early so she could go out to dinner and was late for another. Mother then told James's caregiver that "the visit arrangements were not going to work for her …."

When mother appeared on October 1, 2013, she asked for a continuance because she had been on bed rest and then had the twins and had not been able to meet to discuss the case. The twins had been born three weeks early, via C-section, and mother was unable to talk to her attorney, even by telephone. Mother's counsel also filed a motion seeking to strike the attachments to the original report. Following argument regarding whether the attachments constituted hearsay and could be a part of a review report, the trial court reviewed the case law and then denied the motion, stating that it would give the documents the "appropriate weight." The matter was continued to October 3, 2013.

At the October 3, 2013, hearing, the Agency made an offer of proof that, if called to testify, the social worker would testify that she had not had contact with mother since August 2, 2013; that mother had cancelled visits with James on September 22, and 25, but had visited on September 29, 2013; that none of the adults who lived in the home with mother had been live-scanned as requested by the Agency; and that mother had not had any contact with her counselor.

Mother testified that she had received mental health services and had been assigned a case manager, but she had not yet called her case manager and planned to do so "today or tomorrow." According to mother, her roommate would not let her use her

phone and Brian's car broke down. Mother claimed to have "tried" to have a medical evaluation, but "it didn't really process." She had not seen her primary care physician, who prescribed her medication, for seven months. Mother had not made another medical evaluation appointment because she was waiting to hear from Cindy Ford, although she knew Ford was no longer her counselor.

Mother testified to her homelessness and that she had provided part of the documents needed for housing. She still had not gotten the remaining needed documents, which included Brian's tax return from last year and his birth certificate. Mother testified that she, Brian and the children live in one room in a three-bedroom house and that there are four other adults and a child living there as well. Mother said that she was told by the owner of the house that she could not ask the other tenants to be live-scanned.

Mother acknowledged missing some recent visits with James, one because she had a migraine, another because she had the recent C-section, another because she had to go out of town to see her grandmother, and another because she was at the pharmacy getting something for the twins. She also explained that she missed four visits in a row in July because she thought the visits were suspended.

Mother claimed she had a support system through a church and her family. She also claimed that her recent pregnancy did not affect her ability to care for Hailey and Aubrey.

Mother asked for two additional months of services "just to give [her] a chance," because by then she could get housing, stop breastfeeding and resume medication. Mother stated that she would start to meet with her mental health counselor again.

The social worker testified on rebuttal that she never told mother visits were suspended in July. When the social worker met with mother on July 23, 2013, she told her the visits would be in the park, but mother failed to show for the next four scheduled visits.

9.

After argument, the trial court stated that, because James had special needs, the intent and plan was to slowly reintroduce James into mother's home, but that mother had not been able to provide the stability and regularity with schedules necessary for James. The court noted that, even visits were not consistent and some of the reasons for the missed visits were problematic. In addition, mother's failure to follow through on the Section 8 housing application when six people lived in one room was deeply concerning, as was mother's failure to address her mental health issues.

The trial court found, by a preponderance of the evidence, that return of James to mother would create a substantial risk of detriment. It further found that reasonable services were offered and there was no evidence to indicate that two additional months of services would help. The trial court terminated services and set a section 366.26 hearing. This writ followed.

## CONTENTIONS

Mother contends that (1) the trial court erred in overruling her objection to the attachments to the 18-month review report, and (2) substantial evidence did not support the juvenile court's finding of detriment if James were returned to her custody at the time of the hearing. We disagree.

## DISCUSSION

### I. THE ATTACHMENTS TO THE REPORT WERE PROPERLY ACCEPTED

Mother argues that the trial court erred when it admitted various attachments to the 18-month review report, specifically documents titled "James Information and Observations," "James Visit Information," and anonymous Facebook postings, as well as several statements about her financial condition made by "Shannon" and "paternal aunt" included in the report itself. Mother argues that the items were hearsay and lacked foundation. We find no prejudicial error.

Dependency proceedings "need not be 'conducted with all the strict formality of a criminal proceeding.' [Citations.] As this court has said, '[d]ue process is a flexible

10.

concept which depends upon the circumstances and a balancing of various factors. [Citation.]' [Citations.] [¶] One specific area of dependency jurisprudence where the rules of evidence are relaxed is with respect to the reports and social studies prepared by the caseworker assigned to the family. The reports and studies contain not only the observations and recommendations of the caseworker, but also hearsay statements from family members and other witnesses. Despite their hearsay content, such reports are admissible to assist the court in its determinations. [Citations.] Due process generally requires, however, that parents be given the right to present evidence, and to cross-examine adversarial witnesses, such as the caseworker and persons whose hearsay statements are contained in the reports, 'i.e., the right to be heard in a meaningful manner.'" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 914-915.)

The social worker stated in her report that the document titled "James Information and Observations" was prepared and provided by James' teacher at his elementary school. !(CT 1297, 1315-1318)! The relevance of the document was to assist the juvenile court in understanding James's autistic behaviors and how they changed from day to day, often in proximity to visits with mother. Mother knew the identity of James's teacher and, had she wanted to challenge the veracity of the observations, she could have subpoenaed the teacher.

The attachment titled "James' Visit Information" was kept by James's caregiver at the social worker's request to track the frequent changes and cancelations by mother of the visits. At the hearing, mother testified at length about the various visits she had with James and why she cancelled the ones she did. Had mother wished to challenge the recorded observations, she could have subpoenaed the caregiver for questioning.

The Facebook postings between mother and an anonymous individual related to events that occurred in the previous reporting period and, as acknowledged by respondent, had little relevance to the current reporting period. These particular postings were a major issue and discussed at length without objection in the 12-month review

11.

hearing. Nonetheless, if mother did not believe the postings were from her account, she could have subpoenaed her own records from Facebook.

As for the statements by "paternal aunt" and "Shannon" concerning mother's financial situation contained in the social worker's log note dated June 12, 2013, these certainly fit within the acceptable parameters of "hearsay statements from family members and other witnesses" contained in the report prepared by the social worker. (*In re Lesly G., supra,* 162 Cal.App.4th at pp. 914-915.) Again, mother could have subpoenaed the witnesses had she wanted to.

Mother asked for and received a contested hearing. The social worker was present, but not called to be cross-examined by mother. Neither did mother call James's caregiver, his teacher, or those mentioned in the social worker's report to be cross-examined. There is no question mother was given an opportunity to be heard in a meaningful manner. Due process was not offended by the trial court considering these documents and "giv[ing] the objected items the appropriate weight that this Court feels would be appropriate under the circumstances." We assume the juvenile court did just that. In any event, it is not reasonably probable that the result would have been different had the evidence not been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S FINDINGS

Mother contends that there was insufficient evidence to support the juvenile court's orders terminating reunification services and setting the section 366.26 hearing. We disagree.

"When a child is removed from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a).)" (*Tonya M. v, Superior Court* (2007) 42 Cal.4th 836, 843.) But "[c]hildhood does not wait for a parent to become adequate" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310) and, in the interest of

12.

allowing children "to get on with the task of growing up" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), the Legislature has set 18 months as the maximum period of reunification services, except where reasonable services have not been provided. (§ 361.5, subd. (a).) Accordingly, "'[a]bsent extraordinary circumstances, the 18-month review hearing constitutes a critical juncture at which "the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." [Citations.]' [Citation.] At this point, 'the focus of a dependency proceeding shifts to the child's needs for permanency and stability.' [Citation.]" (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 529.)

At the 18-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that return of the child to his or her parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing detriment." (§ 366.22, subd. (a); rule 5.720.)

"The standard for showing detriment is 'a fairly high one. It cannot be merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being. [Citations.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

In determining whether it would be detrimental to return a child to the parent at the 18-month review hearing, the juvenile court must consider whether the parent participated regularly in and made substantial progress in a court-ordered treatment program, the "efforts or progress" of the parent, and the "extent" the parent "availed

13.

himself or herself of services provided." (§ 366.22, subd. (a); *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.) "The failure of the parent … to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a).)

This court reviews the records to determine whether substantial evidence supports the juvenile court's finding that a child would be at substantial risk of detriment if returned to the parent's custody. (*In re Yvonne W., supra,* 165 Cal.App.4th at pp. 1400-1401.) "[W]e consider the evidence favorably to the prevailing party and resolve all conflicts in support of the trial court's order. [Citation.]" (*Id.* at p. 1401.) Moreover, "[i]t is the trial court's role to assess the credibility of the various witnesses, [and] to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. [Citations.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Mother argues that the Agency did not demonstrate there was a substantial risk of detriment to return James to her care. We disagree. We find that substantial evidence supports the trial court's finding that mother had not made substantive progress in alleviating the concerns that first brought her to the attention of the court. At the beginning of the case, mother was overwhelmed and unable to care for her two children without assistance. Some three years later, mother was still overwhelmed and unable to care for her now six children, four of whom were in her care, without substantial outside assistance of all manner - physical, financial and emotional. Mother did not follow through on help offered and did not take responsibility for her actions. Within the latest recording period, mother failed to follow through on finding appropriate housing; she

14.

failed to obtain a medication evaluation and follow the prescribed medication regime to alleviate some of her mental health symptoms; and she found numerous excuses for cancelling visits with James.

Having determined that substantial evidence supports the juvenile court's finding of detriment, we conclude that the juvenile court did not err in terminating mother's reunification services and setting a section 366.26 permanency planning hearing for James.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final forthwith as to this court.